United States of America v. Tigano

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2017

(Argued: October 12, 2017　　　　　　　　　　Decided: January 23, 2018)

Docket No. 15-3073

_____

UNITED STATES OF AMERICA,

*Appellee*,

v.

JOSEPH TIGANO, III,

*Defendant-Appellant.*[1]

_____

Before: WINTER, WALKER, and POOLER, *Circuit Judges*.

Joseph Tigano, III appeals from his conviction in the United States District

Court for the Western District of New York (Elizabeth A. Wolford, *J.*) on five

---

[1] The Clerk of the Court is directed to amend the caption as above.

counts of drug-related charges, including the manufacture of 1,000 or more marijuana plants, in violation of 21 U.S.C. § 841(a)(1) and § 841(b)(1)(A). Tigano argues that his constitutional and statutory rights to a speedy trial were violated by his nearly seven years of pretrial detention. Because we agree with Tigano that his Sixth Amendment right to a speedy trial was violated, we need not consider his remaining arguments regarding his statutory right to a speedy trial and an alleged Fourth Amendment violation by an aerial infrared scan of his residence. Accordingly, on November 15, 2017, we REVERSED the judgment of the district court and DISMISSED WITH PREJUDICE the indictment on all related charges against Tigano. We remanded to the district court for the limited purpose of releasing Tigano and indicated an opinion would follow.

Reversed.

_____

JOSEPH J. KARASZEWSKI, Assistant United States Attorney, *for* James P. Kennedy, Jr., Acting United States Attorney for the Western District of New York, Buffalo, N.Y., *for Appellee*.

GARY STEIN (Andrew Gladstein, Andrew Joyce, Stephanie Kelly, *on the brief*), Schulte Roth & Zabel LLP, New York, N.Y., *for Defendant-Appellant Joseph Tigano, III*.

POOLER, *Circuit Judge*:

On July 8, 2008, Joseph Tigano, III and his father, Joseph Tigano, Sr., were arrested on charges related to a marijuana growing enterprise allegedly operated by the two men. When Drug Enforcement Administration ("DEA") task force members executed a search warrant at the Tiganos' residence on the morning of the arrest, they discovered over 1,400 marijuana plants. On October 2, 2008, Tigano and his father were each indicted on six counts. Four of the counts charged drug offenses related to the alleged marijuana growing operation; the remaining two counts charged weapons offenses stemming from firearms found at the residence.

Nearly five years later, on November 25, 2013, Tigano's father pled guilty to one count of manufacturing 50 or more marijuana plants. Tigano refused to accept a plea and proceeded to trial—nearly seven years after his arrest—on May 4, 2015. He was convicted by a jury on May 8, 2015 on five of the six counts in the indictment. Tigano was imprisoned during the entirety of the nearly seven years of pretrial proceedings. On appeal, Tigano argues that his Sixth Amendment right to a speedy trial was violated by an oppressive period of pretrial incarceration. On November 15, 2017, this Court filed an Order that reversed the

judgment of the district court and dismissed with prejudice the underlying indictment. We remanded the case for the limited purpose of releasing Tigano from detention and indicated that an opinion would follow. Tigano was released pursuant to that Order on November 15, 2017.

Tigano's facts are exceptional in nearly every meaningful respect within the context of a Sixth Amendment speedy trial analysis. Accordingly, we begin by detailing the circumstances that resulted in Tigano's nearly seven years of pretrial detention. We then offer some historical context for our analysis of this constitutional right in order to better situate Tigano's exceptional facts. Finally, we assess Tigano's delay under the legal framework provided by the Supreme Court in *Barker v. Wingo*, 407 U.S. 514 (1972).

## FACTUAL BACKGROUND

The pretrial detention experienced by Joseph Tigano, III appears to be the longest ever experienced by a defendant in a speedy trial case in the Second Circuit. Tigano's experience is an extreme outlier even among the severe examples found within Sixth Amendment case law. Yet no single, extraordinary factor caused the cumulative seven years of pretrial delay. Instead, the outcome was the result of countless small choices and neglects, none of which was

4

individually responsible for the injustice suffered by Tigano, but which together created this extreme instance of a Sixth Amendment violation. A review of the procedural history reveals that Tigano was the victim of poor trial management and general indifference at every level toward this low-priority defendant in a straightforward case.

## I.   July 8, 2008—April 8, 2009: Arrest, Arraignment, and Hunger Strike

On July 8, 2008, Joseph Tigano, III and his father were arrested. On October 20, 2008, Tigano was arraigned and entered a not guilty plea before Magistrate Judge Hugh Scott. At his arraignment, Tigano (through his then-attorney Thomas Farley) conveyed to the court that he would not accept a plea and wished to preserve his speedy trial rights. The next court meeting on this case was initially scheduled for March 19, 2009, but was rescheduled on motion of Tigano's father, who requested a delay. Tigano's attorney failed to ever convey this change in date to Tigano. When the date of the scheduled conference arrived and no one explained to Tigano why he was not being transported to court, Tigano stopped eating. He later explained to the court that the hunger

strike was his response to being left in his jail cell on a scheduled court date with no explanation from his attorney or the court.

**II.     April 9, 2009—August 11, 2009: First Competency Exam**

On April 9, 2009, the parties convened for the delayed status conference. This status conference would result in the first of what would eventually be three court-ordered competency exams, each of which would confirm that Tigano was competent to stand trial. At this juncture in Tigano's pretrial detention, Farley requested a competency evaluation, which was ordered by Magistrate Judge Scott. The transcript of the proceeding makes clear that the driving motivation for the decision to order a competency exam was Tigano's repeated demand for his speedy trial. Tigano's prioritization of a speedy trial appears to have been his primary point of disagreement with Farley and Magistrate Judge Scott explicitly cited Tigano's repeated insistence on a speedy trial as he ordered the competency evaluation. Indeed, Tigano raised his speedy trial rights no fewer than ten times in this single status conference. It was no mystery to any party that Tigano's top priority was moving quickly to trial. Instead, Magistrate Judge Scott ordered a competency exam and, as a result, the next two status conferences were postponed while the court awaited the results of the competency exam.

**III.    August 12, 2009—January 20, 2010: Unresolved Representation**

The parties were finally able to convene for a status conference on August 12, 2009 after Tigano had returned from his competency evaluation. The exam determined that "he did not suffer from any 'major mental illness,' he had a 'good understanding of his current legal circumstances' and he was able to 'assist properly in his defense.'" Appellant's Br. at 8. Tigano asked the court for permission to proceed pro se, in large part because of conflicts with Farley regarding Tigano's desire to proceed straight to trial as quickly as possible. The court then engaged Tigano in an extended colloquy, and required the government to recite the possible sentence faced by Tigano if he were convicted. At this first hearing after the competency exam, Magistrate Judge Scott told Tigano that he was making a "huge mistake" and that his answers—specifically, his pleas to represent himself so as to proceed quickly to trial—"are tending to make me believe he needs to be evaluated again." App'x at 129. Magistrate Judge Scott declined to decide on the request to proceed pro se, appointed standby counsel to Tigano to explain the risks to him, and scheduled another status conference for two days later. The second status conference was largely a replay of the first: Tigano's standby counsel again confirmed that Tigano appeared to

understand the charges, the government recited the charges Tigano was facing, and Magistrate Judge Scott expressed his skepticism and reserved decision.

Nearly one month later, Magistrate Judge Scott granted Tigano's request to proceed pro se. There followed a series of short status conferences, one of which appears to have been scheduled only because Farley failed to appear as directed to hand over files to Tigano at the previous status conference.

It is during this phase of the proceedings that Tigano's statements in court became increasingly desperate and plaintive as he pleaded for the case to move toward resolution. He continued to repeatedly raise his right to a speedy trial and to plead for severance from his father. As Tigano explained to the court, "What I'm saying is he's a free man. I'm incarcerated. I'm in jail. And my father and his lawyer can actually keep putting motions in to delay this further. I'd like to severance…" App'x at 142. Tigano's father repeatedly moved to delay proceedings. Even so, the court told Tigano that his father had "caused no delay in your case whatsoever." App'x at 142.

**IV.    January 21, 2010—May 16, 2010: Second Competency Exam**

When oral argument was eventually held on January 21, 2010, Tigano appeared with his standby counsel, Cheryl Meyers Buth, who would remain his

8

attorney—either stand-by or appointed—for most of the remaining five-plus years of pretrial detention. The scheduled trial date was postponed at the requests of both the father's attorney and the Assistant United States Attorney ("AUSA"), both of whom had other cases on their calendars. When Tigano's attorney addressed the court in this hearing, she first reiterated Tigano's desire for severance and a speedy trial. She next advised the court that

> despite the fact that there's been a forensic exam finding that Mr. Tigano is competent to proceed, I have serious reservations about his ability to understand the charges and the procedures and represent himself.

App'x at 225.

This advisement from Tigano's attorney prompted Magistrate Judge Scott to order the second competency exam of Tigano and led Tigano to ask, "Another one, sir?" App'x at 229. To be clear, there was no allegation that the first competency exam was defective in any way, nor was there any allegation that there had been a change in Tigano's behavior. Instead, both this second exam and the first exam 281 days earlier appear to have been prompted largely by Tigano's repeated invocation of his speedy trial rights.

At a hearing on March 31, 2010—which Tigano did not attend because he had still not returned from his competency evaluation—the AUSA prosecuting

9

the case acknowledged that Tigano's desire for a speedy trial was part of the rationale for the second competency exam, remarking that "Mr. Tigano III had been sort of demanding his speedy trial, which is part of the prompting for the Court sending him out for this evaluation." App'x at 241.

The report for the second competency exam was received by the court on April 14, 2010—83 days after the hearing at which it was ordered—and acknowledged by Magistrate Judge Scott at an April 16, 2010 suppression hearing. Again, the report indicated that Tigano was competent to stand trial. Again, a hearing was delayed at the request of counsel, this time at the requests of counsel for both Tigano and Tigano's father. Again, Magistrate Judge Scott asked the government to submit an order excluding time under the Speedy Trial Act.

**V.     May 17, 2010—April 4, 2012: Confusion Regarding Multiple Magistrate Judges, Repeated Extensions of Time by Tigano's Father Joined by Tigano's Attorney, and Court Reporter Delays**

Over the course of the next nearly two years, Tigano experienced multiple delays stemming primarily from confusion among judges regarding overlapping motions and an erroneous referral order from Judge Skretny. Most significantly, two separate magistrate judges held in abeyance two separate sets of evidentiary

10

motions until Judge Skretny decided appeals regarding portions of the suppression motion initially decided by Magistrate Judge Scott. That decision was finally issued by Judge Skretny on January 19, 2011 as a three-sentence text order nearly six months after the motions were originally decided.

Additional delays during this period resulted from a variety of small neglects. The long-postponed hearing before Magistrate Judge McCarthy was delayed for an additional 40 days because the government failed to produce discovery in a timely manner. The court reporter submitted the transcript of the one-day suppression hearing 117 days after it was held, delaying the progress of the case by nearly four months. Magistrate Judge Scott issued his report and recommendation on December 15, 2011, nearly seven months after the hearing and more than a year and a half after Tigano had filed his motion.

**VI. April 5, 2012—January 9, 2014: Plea Negotiations, Crowded Court Docket, Father's Competency Issues, and Adjournments by Counsel**

On April 5, 2012, Judge Skretny accepted the reports and recommendations issued by the magistrate judges and advised attorneys that they should submit motions to sever. Tigano's attorney entered no such motion and instead joined the father's request for an adjournment to delay the scheduled

11

status conference. At this point, Tigano entered a new phase of delay caused largely by unsuccessful plea negotiations.

Between the July 10, 2012 status conference—at which Tigano's attorney and the government informed the court that they were involved in plea negotiations —and the father's entry of a plea on November 25, 2013, the court held six status conferences that were each adjourned for one reason or another, each of which reported that Tigano was involved in plea negotiations with the government. A large part of the reason for this period of delay was that the government waited nearly a year to present Tigano a written plea offer. The transcript from the May 28, 2013 status conference indicates that AUSA Thomas S. Duszkiewicz was involved in a major criminal trial and Tigano's case had taken a definitive back seat within the U.S. Attorney's office. Indeed, an AUSA stepped in for Duszkiewicz at the May 28, 2013 status conference, and conceded when questioned about the delay, "[t]his is definitely not the defense's issue," citing Duszkiewicz's lengthy trial and gaps in information within the U.S. Attorney's office as reasons for the delay in the presentation of a written plea. App'x at 661.

12

When Tigano's attorney finally received the written offer, it was sent to her the day before a scheduled status conference, which resulted in yet another adjournment because she had not yet had an opportunity to present the plea to Tigano. At this status conference, as with several prior conferences, AUSA Duszkiewicz reiterated his view that the plea agreement was a "two-for-one" offer, meaning both defendants had to plead for either of them to receive the deal. App'x at 669.

The August 1, 2013 status conference resulted in yet another adjournment, in part so that Tigano's attorney could try to convince him to accept the plea he consistently rejected and "in part . . . because of [the court's] trial calendar right now." App'x at 680. When it came time to set trial dates at the September 20, 2013 conference both the government and the court raised scheduling challenges due to congested calendars. On December 16, 2013, the parties met for the final pretrial conference before the trial scheduled for the following day. Yet again, the court delayed the trial, in part to give Tigano time to consider a plea, observing "You spent some time in jail. I don't think waiting until January is going to really materially affect anything." App'x at 720.

13

## VII.　January 10, 2014—September 2, 2014: Third Competency Exam

On January 10, 2014, Tigano's attorney filed under seal a motion for another competency evaluation of Tigano. This sealed motion included an affidavit from Meyers Buth attesting to her belief that "in refusing to plead guilty and insisting on his right to a trial, Tigano was acting 'imprudent[ly]' and 'not in his best interest.'" Appellant's Br. at 26 (quoting affidavit). Meyers Buth also attached a letter from a private psychologist she retained to evaluate Tigano who also concluded that Tigano was competent to stand trial and explicitly concurred with the two previous competency evaluations.

On January 15, 2014, the parties reconvened for a status conference that would result in Tigano's third court-ordered competency exam. The government supported Meyers Buth's motion at the status conference. The AUSA indicated that he had been prepared at the last status conference "to suggest that we obviate the need for a hearing and that we send Mr. Tigano out for another examination." App'x at 766. AUSA Duszkiewicz's rationale for the need for a third court-ordered competency exam was

> not necessarily the competency question, but whether there is some other
> psychological problem that's going to prevent him from understanding the

14

difference between what he potentially looks at as far as a conviction as well as what's being offered by way of this plea.

App'x at 767. In other words, the basis for the competency exam was Tigano's refusal to accept a plea. Judge Skretny referred the matter back to Magistrate Judge Scott while opining that "whatever time it takes, it takes." App'x at 769.

As of the March 4, 2014 scheduled status conference—48 days after Judge Skretny referred the matter to Magistrate Judge Scott—the U.S. Marshals Service ("USMS") still had not transported Tigano to his competency evaluation. Magistrate Judge Scott approved a 15-day extension for the competency exam at the request of the warden of the Metropolitan Correction Center ("MCC") in New York City, where Tigano was undergoing the evaluation. The warden reported that the MCC was experiencing a "high volume of cases" and would not be able to complete the evaluation in time. App'x at 776, 778. The competency evaluation was filed under seal on April 15, 2014. Tigano was briefly under medical hold for some medical issues that arose at MCC, but was released from medical hold on May 2, 2014. The USMS seems to have lost track of Tigano while he was at MCC, such that two pretrial conferences were held without any movement on the case and another was adjourned because Tigano was absent

15

and the date of his return remained uncertain. On July 30, 2014, Tigano finally appeared with Meyers Buth before Magistrate Judge Scott, who accepted the competency determination of this third court-ordered psychological exam. The third competency evaluation established nothing new.

During this period of limbo for Tigano at MCC, he filed a pro se motion styled as a petition for a writ of habeas corpus. That motion was received by the court of the Western District of New York on May 12, 2014 and denied by Judge Skretny 15 weeks later, because Judge Skretny refused to consider a pro se motion filed by a represented defendant. The Niagara County jail destroyed all of Tigano's trial-related papers while he was away at MCC.

**VIII.  September 3, 2014—May 3, 2015: Scheduling Delays for Trial**

On September 3, 2014, the parties convened for a pretrial conference and prepared to go to trial with Tigano representing himself and Meyers Buth appearing as standby counsel, given her discomfort with Tigano's preferred trial strategy. At the October 23, 2014 status conference, it was determined that Meyers Buth would indeed represent Tigano at trial.

In anticipation of his March 8, 2015 retirement, Judge Skretny reassigned Tigano's case to Judge Elizabeth Wolford on January 27, 2015. Tigano filed a

16

motion for bail on February 25, 2015, which was denied without prejudice on March 5, 2015. Tigano's jury trial began on May 4, 2015, 6 years, 9 months, and 26 days after his arrest. On May 8, 2015, he was convicted on five drug-related charges and one weapons charge.

## DISCUSSION

### I. History of the Speedy Trial Right

Recognition of the critical need for criminal defendants to proceed to trial in a timely manner has a long and auspicious history in American law and English common law. The Supreme Court detailed much of this history in its 1967 speedy trial case, *Klopfer v. North Carolina*, which held that the right applied to the states through the Fourteenth Amendment. 386 U.S. 213, 222-23. The *Klopfer* Court cited a twelfth-century case from the Assize of Clarendon instructing sheriffs to bring defendants to the traveling justices when the judges "are not about to come speedily enough into the country where they have been taken" in order to ensure a prompt trial for the criminal defendants. *Id.* at 223, n.9 (quoting 2 *English Historical Documents* 408 (David C. Douglas and G.W. Greenaway eds. 1953)). The Magna Carta incorporates this requirement in its

17

early thirteenth century language establishing basic guarantees of justice: "We will sell to no man, we will not deny or *defer* to any man either justice or right." *Id.* at 223 (emphasis added) (quoting Magna Carta, c. 29 (c. 40 of King John's Charter of 1215) (1225), translated and quoted in Sir Edward Coke, *The Second Part of the Institutes of the Laws of England* 45 (Brooke, 5th ed., 1797) ("Coke's *Institutes*")). The early seventeenth century commentaries on English common law by Sir Edward Coke interpreted the Magna Carta's language as guaranteeing to any defendant the right to justice "speedily without delay." *Id.* at 224 (quoting Coke's *Institutes* 45).

When it came time for the nascent states to draft their own constitutions and declarations of rights, the long-established right to prompt justice was often incorporated. In 1776, both Maryland's Declaration of Rights and Virginia's Bill of Rights included a right to "a speedy trial by an impartial jury." Francis H. Heller, *The Sixth Amendment to the Constitution of the United States: A Study in Constitutional Development* 22-23 (1969). Delaware, Massachusetts, and Pennsylvania also included the clause in their original state constitutions. Alfredo Garcia, *The Sixth Amendment in Modern American Jurisprudence: A Critical Perspective* 159, n. 23 (1992). When Anti-Federalists raised concerns regarding a

18

too-strong national government, the remedy adopted by the Constitutional Convention—the Bill of Rights—incorporated the longstanding right to a speedy trial as one of the essential protections of individual rights against the risk of arbitrary governmental power. U.S. Const. amend VI.

"[T]he right to a speedy trial is as fundamental as any of the rights secured by the Sixth Amendment." *Klopfer*, 386 U.S. at 223. Its origin in our legal system dates back over 800 years and it was understood as part of the essential safeguards against the newly formed government of the United States. Further, while a defendant may waive his statutory right to a speedy trial by failing to raise it, he cannot waive his constitutional right. *See Barker v. Wingo*, 407 U.S. 514, 529-30 (1972).

Though the right may appear abstract and relative, the Supreme Court and this Court have laid out clear methods in determining whether a defendant's constitutional speedy trial right has been violated. We now turn to the controlling law and apply it to the exceptional facts of this case.

**II.    *BARKER v. WINGO***

In 1972, the Supreme Court decided *Barker v. Wingo*, a Sixth Amendment speedy trial case that arose out of a brutal double murder in Christian County,

19

Kentucky. 407 U.S. 514, 516 (1972). Barker, the defendant-appellant before the

Supreme Court, was imprisoned for ten months before being released on bond

while awaiting trial. *Id.* at 517. The Supreme Court observed that Barker

appeared to be "gambling" on the acquittal of his co-defendant, hoping that an

acquittal for the co-defendant would make it harder to prosecute him. *Id.* at 535-

36. Over five years passed between Barker's arrest and eventual trial. *Id.* at 533.

In coming to the conclusion that Barker's speedy trial right had not been

violated—the Supreme Court believed the record strongly indicated "that the

defendant did not want a speedy trial," *id.* at 536—the *Barker* Court established

the four-part balancing test that guides our analysis today. Specifically, the

Supreme Court identified four key factors: "[l]ength of delay, the reason for the

delay, the defendant's assertion of his right, and prejudice to the defendant." *Id.*

at 530.  In establishing this balancing test, the *Barker* Court emphasized that:

> We regard none of the four factors identified above as either a necessary or
> sufficient condition to the finding of a deprivation of the right of speedy
> trial. Rather, they are related factors and must be considered together with
> such other circumstances as may be relevant. In sum, these factors have no
> talismanic qualities; courts must still engage in a difficult and sensitive
> balancing process. But, because we are dealing with a fundamental right
> of the accused, this process must be carried out with full recognition that
> the accused's interest in a speedy trial is specifically affirmed in the

Constitution.

*Id.* at 533.

Consequently, we turn now to an analysis of these four factors with an understanding that no single factor is dispositive and that each serves to guarantee a fundamental, enumerated right of the accused.

**A. Length of Delay**

"The length of the delay is to some extent a triggering mechanism," because until there exists "some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Id.* at 530. Once a delay has been established, "the burden is upon the government to prove that the delay was justified and that appellant['s] speedy trial rights were not violated." *United States v. New Buffalo Amusement, Corp.*, 600 F.2d 368, 377-79 (2d Cir. 1979) (citation omitted). In *Buffalo Amusement*, appellants experienced a "54-month delay between indictment and date of trial" during which time the defendants were free on bond. *Id.* We found that delay to be "unquestionably substantial" and a factor that "must weigh heavily in support of appellants' claim that their rights have been violated." *Id.* at 377.

21

Tigano's delay—nearly seven years of pretrial detention—is, to our knowledge, the longest delay recorded in the Sixth Amendment case law of our Circuit. Indeed, the government concedes that the length of delay cuts in favor of Tigano. This Court recently affirmed a district court dismissal—also originating in the Western District of New York—on Sixth Amendment speedy trial grounds. *United States v. Pennick*, No. 16-3069-cr, 2017 WL 4994465 (2d Cir. Nov. 2, 2017) (summary order). The defendant in *Pennick* had been subjected to "fifty-four months in pretrial detention and twenty-five months on electronically-monitored home incarceration," which we deemed "extraordinary." *Id.* at *1-*2. Tigano's extreme facts thus force the government to account for its delay and "prove that the delay was justified and that [Tigano's] speedy trial rights were not violated." *Buffalo Amusement*, 600 F.2d at 377. The extreme length of delay thus weighs heavily against the government.

**B. Reasons for Delay**

The *Barker* Court instructed that "different weights should be assigned to different reasons." *Barker*, 407 U.S. at 531. *Barker* established a spectrum of weights, in which "deliberate" attempts to delay trial weighed most heavily against the government, "valid" reasons for delay such as missing witnesses are

22

taken off the scale entirely, and reasons of "negligence or overcrowded dockets" are weighted somewhere in the middle, because "the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." *Id.* This factor must take into account the affirmative duty of the district court and the government to monitor the progress of a criminal case toward disposition and to take steps to avoid unnecessary delay where possible. "We have repeatedly emphasized that affirmative action by the government in bringing cases to trial is mandated and that it cannot escape this duty on the ground that the delay is for institutional reasons." *United States v. Vispi*, 545 F.2d 328, 334 (2d Cir. 1976) (citation omitted). Incredibly, the government contends that "none of the delay is attributable to the government."[2] Appellee's Br. at 26.

The reasons for the delay in this case were largely due to: 1) the needlessly repetitive and dilatory competency examinations, all of which found Tigano competent; 2) administrative delays, including the delay in conducting the third

---

[2] We observe that the same U.S. Attorney's Office in the Western District of New York made the same extraordinary claim in *Pennick*, which we found unpersuasive in that case, as well. *Pennick*, at *2. [Brief for Appellant, 16-3069-cr (2d Cir. Feb. 24, 2017) (ECF No. 27 at 16) ("[N]one of the delay is attributable to the government.")].

court-ordered competency hearing (itself unnecessary in light of the two prior court-ordered exams and hearings) because the USMS failed to provide timely transportation; 3) the government's failure for months to produce a written plea offer, despite the age of the case, and its insistence on consolidating the case and plea bargaining with Tigano's father; 4) the district court's congested docket and failure to give this case priority; 5) the use of multiple magistrate judges resulting in confusion regarding responsibility and one judge having to await rulings by another; and 6) defense counsel's desire to delay the trial in hopes of a favorable plea, notwithstanding Tigano's express desire to proceed quickly to trial.

### 1. Competency Evaluations

We first turn to the most complex set of facts for the delay, namely, the three separate competency exams ordered by the magistrate judge. Each of these exams—and an additional exam conducted by a private psychologist retained by Tigano's attorney—concluded that Tigano was fully competent to stand trial. There is no evidence in the record—either in open court or in documents filed under seal—that any party or officer of the court had any concerns about the quality or legitimacy of any one of these exams. And while the exams suggest that Tigano may have an eccentric personality, they each clearly state that he

24

understood the charges against him and was capable of aiding in his own defense.

Indeed, the examinations are strikingly consistent with one another in their assessment that Tigano clearly understood what was happening and was capable of assisting in his own defense. Yet all parties involved—the court, the government, and Tigano's own attorney—participated in steering him through three court-ordered exams. The details of each of those decisions have already been recounted, but it is worth reiterating the truly remarkable fact that for both the second and third court-ordered exams, the government acknowledged in open court that at least part of the motivation for the exam was Tigano's assertion of his speedy trial right and his refusal to accept a plea, respectively. No party argued that there was new information or a change in circumstances to justify yet another exam and attendant delay.

Motions for mental competency determinations are made pursuant to 18 U.S.C. 4241(a), which permits defense or government attorneys to move for a hearing on competency which "[t]he court shall grant . . . if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is

25

unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." Court-ordered psychological exams for the purposes of determining competency prior to the hearing are permitted under 18 U.S.C. 4241(b).

It was error for the district court to send Tigano out for evaluation by a third court-appointed psychologist simply because he refused to accept a plea, when that was the only evidence of "incompetency" before the district court and three separate psychologists (two who were court-ordered and one who was privately retained) had already attested to his competency to stand trial and assist in his own defense, as acknowledged by the magistrate judge who issued the order. We thus count these delays against the government.

**2. Administrative Delays**

Tigano's trial date was also delayed by the USMS and the court reporters in the Western District of New York. Tigano's third court-ordered competency evaluation resulted in a seven-month delay (January 2014 – July 2014)—double the combined length of the first two court-ordered competency evaluations. This delay appears to have been due to the USMS's failure to provide timely transportation to and from the site of the examination. Both the court and the

26

government should have monitored the situation and prevented the delay. *See United States v. Carini*, 562 F.2d 144, 149-50 (2d Cir. 1977) ("While it is . . . true that 'institutional' delays are not counted as heavily against the government as are delays caused or encouraged by the prosecution for tactical reasons," delays "occasioned by . . . unexplained inaction of the District Court, caused, no doubt, by an overloaded docket . . . are properly chargeable against the government under prevailing case law.") (collecting cases). Specifically, when the court granted the request for the third competency evaluation, it should have issued a time limit and instructed the parties to be ready for trial when Tigano was found competent yet again.

Tigano's trial was also delayed by the court reporters of the Western District of New York. At one point, both defendants were forced to wait 117 days for a transcript of a one-day suppression motion, because they were ordered to file their submissions within 30 days of receiving that transcript. At many points along the way, transcripts arrived only after long delays.[3] Administrative delays

---

[3] We observe that many of the transcripts filed in this case were significantly and inexplicably delayed. The transcript of the September 4, 2008 preliminary exam for both defendants was filed 186 days later and the transcript of May 27, 2010 oral argument on pretrial motions took 139 days to file. Transcripts filed after

are counted against the government, since it is not the defendant's responsibility to monitor the speed at which court reporters produce transcripts or at which USMS provides court-ordered transportation.

### 3. Plea Negotiations

Initial plea negotiations consumed approximately one year, which we have held is time that must be counted against the government. *See, e.g.*, *Buffalo Amusement*, 600 F.2d at 378 ("Good faith plea negotiations by a defendant should not be equated to a waiver of speedy trial rights, and, under the circumstances, the government must assume responsibility for the risk of institutional delays where the bargain ultimately is unsuccessful."). It is particularly appropriate to construe the time against the government in this case because it took the government nearly a year to actually present a written plea offer to Tigano. When it finally presented the plea offer, it did so on the night before the

---

trial were even more egregiously delayed, ranging from 205 days for the filing of the sentencing hearing to an outrageous 2,194 days—or, 6 years and 2 days—for the October 20, 2008 arraignment. Transcripts are essential tools to advocates in the course of trial preparation and trial, as well as on appeal. These delays are suggestive of substantial problems regarding the ability of criminal defendants to obtain transcripts in the Western District of New York.

scheduled conference, forcing Meyers Buth to request a 30-day continuance because she had not had any opportunity to review the plea offer with Tigano.

We additionally observe that the district court should have set a firm cutoff date for plea negotiations rather than allow them to drag on for one-and-a-half years. Indeed, about ten months into the plea negotiations—and we qualify the word "negotiations" because Tigano had made clear from the time of his arraignment that he had no interest in a plea—the government informed the court that it had yet to present a written offer to Tigano. At that point, the district court should have ordered the government to present its plea offer within a reasonable number of days, and scheduled a trial after a brief period for negotiations. Moreover, some of the delay was caused by the government's insistence on joint negotiations with Tigano's father.

We have held that the time spent in plea bargaining is a gamble taken by the government regarding the defendant's speedy trial rights and is properly counted against the government. *See Buffalo Amusement*, 600 F.2d at 378. The government obliquely asserts that the process of plea bargaining counts against Tigano, but this is incorrect. The substantial delay caused by the government's failure to timely produce a written plea offer, its obstinacy in insisting on a joint

29

resolution, and the court's failure to monitor the endless delays occasioned by the "negotiations" are all attributed to the government.

### 4. District Court Congestion

Delays due to "overcrowded courts," are counted against the government. *Barker*, 407 U.S. at 531. It is clear that court congestion—and a failure of the court to prioritize this long-lingering criminal case—contributed to the substantial delay faced by Tigano. For example, even though its calendar was congested, the court could have set a trial date when Tigano's attorney informed the court that plea negotiations had failed and that she was ready to proceed to trial on October 23, 2014, over six months before the trial ultimately commenced. Considering that this was a 2008 criminal case and that Tigano was incarcerated throughout the entire pretrial period, the court should have given priority to this case. Additional delays were caused by the court's crowded docket, for example, at the August 1, 2013 and September 20, 2013 status conferences, when the court conceded that adjournments were being granted in part to accommodate the court's congested calendar. At the time of those status conferences, Tigano had already been detained for over five years. It is difficult to imagine a case that would have warranted scheduling priority over Tigano, yet time and again this

30

low-priority case took a backseat to competing demands. Again, we conclude that this time must be counted against the government.

## 5. District Court Use of Magistrate Judges

On May 17, 2010, the magistrate judge who had been handling all of the nearly two years of pretrial activity properly recused himself from the suppression motion, because he had been the issuing magistrate of the search warrant. Rather than deciding the suppression motion itself and sending it back to the same magistrate, however, the district court split the motions and sent them to two separate magistrates, despite the fact that they involved the same set of facts. The motions were further delayed because of confusion among the magistrates about who had authority over which issues, so that the magistrates sat on their respective motions until the discovery appeal was determined by the district court. In the end, Tigano spent two years in jail while this confusion was sorted out.

There is no evidence the government was deliberately dilatory in its handling of these motions. Instead, the delay seems attributable to a series of misunderstandings and delays, as well as some poor decisions by the district court regarding court efficiency. However, *Barker* makes clear that "neutral"

31

delays must be considered "since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." *Barker*, 407 U.S. at 531.

### 6. Dilatory Tactics of Defense Counsel

Despite Tigano's repeated demands for a speedy trial, his attorney requested multiple extensions and failed to urge the district court to set a trial date. It seems likely that she wanted Tigano to plead to the reduced charge and was repeatedly frustrated by Tigano's continued refusal to consider a plea and insistence on going to trial. Indeed, Tigano's attorney requested several delays for the purpose of trying to convince Tigano to accept a plea, requested or caused other delays because of her discomfort with Tigano's trial strategy, and generally acceded to the requests for delays by Tigano's father, rather than asserting Tigano's right to a speedy trial or his desire for severance.

Though her intentions may have been admirable, it is a bedrock rule of professional conduct that the decision to accept or reject a plea is ultimately a decision made by the client. *See, e.g.*, American Bar Association Model Rules of Professional Conduct R. 1.2(a). It is also fundamental that an attorney may not

coerce a client into accepting a plea. *Purdy v. U.S.*, 208 F.3d 41, 45 (2d Cir. 2000).

This Court has explicitly instructed lower courts that:

> [T]he defendant and not the court should decide what strategy should be pursued to adequately protect the defendant's interest. To take this choice out of his hands would deprive him of the right to conduct his defense in his manner and in accordance with his own standards.

*U.S. v. Anderson*, 394 F.2d 743, 748 (2d Cir. 1968). In the same vein, we have previously held that, "[i]t is the role of the lawyer to be a professional advisor and advocate, not to usurp his client's decisions concerning the objectives of representation." *U.S. v. Wellington*, 417 F.3d 284, 289 (2d Cir. 2005) (internal citations and punctuation omitted). It would be improper to count these delays against the objecting defendant, and we decline to do so in this case.

It will be an exceptional case where, as here, a delay caused by a defense attorney counts against the government, under the *Barker* analysis, and not the defense. Unless the record shows otherwise, we normally presume that a defense attorney is carrying out his or her client's chosen trial strategy and that any delays resulting from that strategy count against the defendant.

**C. Defendant's Assertion of the Right**

33

We also must consider the defendant's own assertion of his right to a speedy trial. "The defendant's assertion of his speedy trial right . . . is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." *Barker*, 407 U.S. at 531-32. On this factor, Tigano's case again presents exceptional facts.

Tigano adamantly, consistently, and explicitly raised his speedy trial rights at nearly every appearance he made before the court. At his October 20, 2008 arraignment, Tigano's attorney at the time told the district court, "He also had indicated to me that he does not wish to waive his speedy trial rights." App'x at 56. At his next appearance on April 9, 2009, when the district court asked Tigano about a delay for a competency evaluation in the wake of his hunger strike, Tigano explained to the district court, "Sir, I mentioned it the last time I was in court, I don't want to waive my right to a speedy trial. And that—that's my main concern." App'x at 68. During this same hearing, the district court instructed Tigano's attorney that there was no need to add a written statement to the record regarding Tigano's desire for a speedy trial because "he's already stated that on the record, and he thinks it's necessary to do it by writing. It's on the record, leave it there." App'x at 79. This pattern continued nearly every time Tigano

appeared before the district court, to the extent that the government observed at a March 31, 2010 hearing that the repeated speedy trial demands were part of the reason for the district court's decision to have Tigano's competency evaluated. App'x at 241 ("Mr. Tigano III had been sort of demanding his speedy trial, which is part of the prompting for the Court sending him out for this evaluation."). Incredibly, the government now argues that Tigano made no formal assertion of his speedy trial right for purposes of the Sixth Amendment analysis. We dismiss that argument as implausible based on the facts and inapposite based on the law; a defendant may waive his statutory right to a speedy trial by failing to formally raise it, but not his constitutional right. *Barker*, 407 U.S. at 529-30 ("We, therefore, reject . . . the demand-waiver rule because it is insensitive to a right which we have deemed fundamental. The approach we accept is a balancing test, in which the conduct of both the prosecution and the defendant are weighed.")

Tigano requested his speedy trial so frequently and vociferously that it is simply inconceivable the government was not "put on notice" that this issue would resurface if Tigano's speedy trial rights were not protected. *Buffalo Amusement*, 600 F.2d at 378. Having offered this analysis, we do not mean to suggest that the words "speedy trial" ought to function as a magical incantation

that guarantee an immediate trial to any defendant who so wishes. We acknowledge that there are many legitimate reasons why trials may be delayed. Nor do we expect every defendant to raise the issue as frequently as Tigano in order to preserve his right to a speedy trial. On this point we reiterate that the right to a speedy trial is a right explicitly enumerated in the Sixth Amendment. A defendant's lack of vigor in pursuing this right—or his deliberately dilatory behavior in forestalling trial—are factors to be considered in our analysis, but a defendant's failure to formally raise the right via motion does not necessarily count against the defendant, as the government argues it should. The speedy trial right is guaranteed to all defendants by the Sixth Amendment and its precise contours are determined by courts on an "ad hoc basis" considering the facts of each case, including the defendant's invocation of that right. *Barker*, 407 U.S. at 530. Formal procedural requirements are out of place in this context.

We also observe that this case raises a new wrinkle to the fact patterns of the speedy trial cases in our Circuit. While Tigano himself made very clear that he desired a speedy trial, this desire was not always echoed by or reflected in the choices made by his attorney. These facts are unusual in this area of law and distinguish this case from others within this Circuit's speedy trial jurisprudence.

36

Accordingly, we conclude that in the context of a speedy trial action such as this one, a defendant's assertion of his own right to a speedy trial—even though ignored or contravened by his counsel—is the relevant fact for purposes of Sixth Amendment analysis. Quite simply, the right to a speedy trial belongs to the defendant, not to defendant's counsel.[4]

### D. Prejudice to the Defendant

The last *Barker* factor to examine is the prejudice to the defendant occasioned by the delay. Prejudice should be assessed in regard to those interests the Sixth Amendment right to a speedy trial is designed to protect, namely, "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Barker*, 407 U.S. at 532. While the last factor is "the most serious," it is only one of three interests protected by the Sixth Amendment right to speedy trial. *Id.*

---

[4] The Seventh Circuit has observed that "the right is ill-suited to rigid forfeiture rules," and that *Barker's* balancing of the defendant's assertion of the right is the better approach. *United States v. Oriedo*, 498 F.3d 593, 596 (7th Cir. 2007). The Ninth Circuit has similarly rejected rigid forfeiture rules in a statutory context under the Speedy Trial Act, 18 U.S.C. 3161 et seq. *See, e.g.*, *United States v. Hall*, 181 F.3d 1057, 1060-61 (9th Cir. 1999) ("[W]here defense counsel does not assert his client's right to a speedy trial, a defendant may alert the court directly of his desire not to waive those rights.").

Affirmative proof of impairment of the defense is not required in order to find a Sixth Amendment violation. *See, e.g.*, *Doggett v. U.S.*, 505 U.S. 647, 655 (1992) ("affirmative proof of particularized prejudice is not essential to every speedy trial claim") (citation omitted).

Tigano was severely prejudiced in terms of the first two factors. His nearly seven years of pretrial incarceration were egregiously oppressive; we reiterate that this appears to be the longest period of pretrial incarceration we have seen in a speedy trial context in this Circuit. In addition to the sheer passage of time, his confinement in local jails makes those years particularly oppressive. The *Barker* Court noted that "[m]ost jails offer little or no recreational or rehabilitative programs. The time spent in jail is simply dead time." *Barker*, 407 U.S. at 532-33. Nearly seven years of pretrial detention in local jails—before the defendant has been convicted of any crime—is precisely the type of prejudice contemplated by the right to a speedy trial. Tigano amply demonstrates prejudice on this point.

The second interest protected by the Sixth Amendment right to a speedy trial is the interest in minimizing the "anxiety and concern" of the accused. *Id.*, 407 U.S. at 532. On this point, Tigano was severely prejudiced. Tigano repeatedly

38

expressed his anxiety to the district court and explicitly cited that anxiety as the primary motivation for his desire for a speedy trial:

> Basically time is going by, and more time goes on I'm just—how would you say, just moving on in the past. Longer this takes, harder it is to remember everything that's happens. [sic] The sooner it happens, the better.

App'x at 127-28.

Tigano told the district court he wanted to proceed pro se because "[i]t will just resolve this matter, sir." App'x at 150. He later expressed his anxieties by explaining

> [t]hat's why I was trying to go with the speedy trial thing, knowing that, if anything, my dad, if he can't stick around here, maybe he'd stay with my mother, in, you know, the other part of New York, eastern New York. Otherwise, I'm hoping to push things ahead. This way however— whatever gets determined, I'm more, how would you say, everything has been taken away from me. So to me, whatever you guys want me to have, or do, I'm trying to bring right to the front, and go with it.

App'x at 213. Tigano made clear that he preferred to have the matter decided rather than living with the anxiety and uncertainty of charges hanging over his head. Nearly seven years of delay in a trial the AUSA described as "very simple," App'x at 829, imposes an inexcusable amount of anxiety on the

39

unconvicted defendant. This anxiety is the type of prejudice the Sixth Amendment right to a speedy trial was designed to prevent.

### E. Balancing Test

Weighing the four *Barker* factors leads us to the inescapable conclusion that Tigano's Sixth Amendment right to a speedy trial was violated by his nearly seven years of pretrial incarceration. The reasons for delay fall largely on the district court and government attorneys. Tigano's repeated assertions of his right to a speedy trial place him on the extreme end of our Circuit's case law. His repeated pleas for trial also speak to the fourth and final prong, the prejudice suffered by Tigano in the form of anxiety and the oppressiveness of his lengthy period of pretrial incarceration. The only remedy is to dismiss the case with prejudice, *Strunk v. U.S.*, 412 U.S. 434, 440 (1973), which we did via court order on November 15, 2017.

## CONCLUSION

We reiterate that the nearly seven years of pretrial detention in this case, as well as Tigano's single-minded focus on obtaining a speedy trial, present extreme facts in the speedy trial context. In other words, these facts represent what we expect will be a ceiling, rather than a floor, for Sixth Amendment

40

analysis. Yet the case is no less significant because of its outlier status. Years of subtle neglects resulted in a flagrant violation of Tigano's Sixth Amendment right to a speedy trial. On January 21, 2010, the slow progression of the case left Tigano to reflect that "[s]o much time has gone by." App'x at 225. He would wait another 1,929 days—over 5 years—before his case would eventually proceed to trial. Tigano's years of imprisonment represent a failure of our courts to comply with their obligation to bring defendants to "a speedy and public trial." U.S. Const. amend. VI.

Because we find that Tigano's Sixth Amendment right to a speedy trial was violated, we need not consider Tigano's remaining claims. Accordingly, the judgment of the district court is REVERSED and the indictment is DISMISSED WITH PREJUDICE.