People v Woods

2026 NY Slip Op 02364

April 21, 2026

Court of Appeals

Rivera, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This decision is uncorrected and subject to revision before publication in the Official Reports.

The People & c., Respondent,

v

Travis Woods, Appellant.

Decided on April 21, 2026

No. 31

Matthew Bova, for appellant.

Christian Rose, for respondent.

Rivera, J.

[*1]

Three juries deadlocked and failed to convict defendant on murder and criminal weapon possession charges. The prosecution retried defendant within months after each of the first two trials, but then delayed more than three years before proceeding with the fourth trial.

We agree with defendant that the prosecution failed to justify this final lengthy delay, instead offering vague and unsubstantiated claims that this time was needed to assess whether to dismiss the charges or try the case again. Therefore, defendant's murder and weapon possession charges must be dismissed. However, we reject defendant's challenge to his conviction on drug-related charges at his first trial based on the trial court's failure to provide defendant notice of two jury notes asking for the testimony of certain witnesses. That error does not warrant reversal, because on the very next day of trial, the jury sent another note requesting the same testimony from the same two witnesses, and defense counsel read this note and participated in choosing the testimony that was read back to the jury.

I.

Defendant Travis Woods was initially tried in 2008 on charges of second-degree murder for the 2006 fatal shooting of Barry Miller and second- and third-degree criminal possession of a weapon based on that shooting. He also faced charges for the attempted murder of Jermaine Gordon, first-degree assault, and second- and third-degree criminal possession of a weapon. Finally, defendant was also tried on drug-related charges, including criminal sale of a controlled substance in or near school grounds, and fourth-degree criminal sale of a controlled substance. In October 2008, a jury convicted defendant of the drug-related charges and acquitted him of the charges relating to the Gordon shooting, including the attempted murder count. However, the court declared a mistrial on the Miller murder and criminal weapon possession charges after the jury deadlocked on those counts. In January 2009, defendant was sentenced on the drug counts to a nine-year aggregate prison term.

The jury again deadlocked on the murder and weapon possession charges after the next two retrials, in April of 2009 and 2010, resulting in two more mistrials. On April 29, 2013, defendant moved to dismiss the indictment on speedy trial grounds. The trial court denied the motion on June 4, 2013, and the fourth trial commenced that same day.

The following brief chronology of events between the third and fourth trials is undisputed. Of the approximately 20 calendar calls when at least one party appeared, during the three years of delay, the prosecution failed to appear—despite defense counsel's presence—at least six times, and requested an adjournment through a stand-in prosecutor at least five times. On other occasions, a stand-in prosecutor appeared with little information about the status of the case and without requesting an adjournment on the record. At a calendar call on September 10, 2010, approximately four months after the third mistrial, the prosecution asserted that it had decided to retry the case but was not sure "when" or by "who[m]." In November 2012, R.G., an eyewitness for the prosecution at the first three trials who identified defendant as having shot Miller, died. Ultimately, ten different stand-in prosecutors made appearances at various calendar calls from 2010 to 2012 before a prosecutor was permanently assigned the case. Finally, 32 months after the third mistrial, on January 11, 2013, defense counsel conveyed that the case was "no longer without a prosecutor" and identified who had been assigned to the case. At this same appearance, defense counsel requested a motion schedule to file a motion to dismiss.

In opposition to defendant's motion to dismiss on constitutional and statutory speedy trial grounds, the prosecution asserted that "the bulk of" the delay had been caused by a "series of meetings held within the District Attorney's office at the request of defense counsel who sought a dismissal of charges in the interest of justice." The prosecution also asserted the legal principle that "delay occasioned by legitimate prosecution efforts to reassess and reinvestigate a case should not result in dismissal, provided that such efforts proceed in good faith and are not deliberately protracted to gain a tactical advantage over the defense" (citing Barker v Wingo, 407 US 514, 531 [1972]) and stated without elaboration that "[s]uch certainly is the case here." The prosecution further blamed the delay on "the practical reality of reassignment of the case to a new prosecutor, who obviously required time to familiarize himself with such a serious and relatively complex case."

The prosecution eventually indicated that it was ready for retrial on April 29, 2013, three full years after the third mistrial. On that day, the newly assigned prosecutor stated that the prosecution had "been ready for trial continuously for three months. This is a six-year old homicide case."

At the fourth trial, the prosecution presented, amongst other evidence, the testimony of E.C. and R.G., each of whom had testified at the prior trials that defendant shot Miller. As R.G. had died by this point, the prosecution introduced his prior testimony by readback of the transcripts from the first and third trials, over defendant's objection.

The prosecution also presented testimony from a new witness, R.L., who did not identify defendant as the shooter and said he had not made a prior identification of defendant in 2006, contrary to the prosecution's assertions during summation. Specifically, R.L. testified that he saw Miller "walking across the street" before he was killed and heard gunshots but did not remember who shot Miller.

The defense sought to discredit the prosecution's eyewitnesses, calling E.C. and R.G. "opportunists and . . . liars" during summation and pointing out inconsistencies in R.G.'s former testimony, which could not be explained now that R.G. was dead. The defense also asserted in summation that R.L. was similarly unreliable, had "pretty much disqualified himself as a witness," and that any prior identification of defendant in 2006 could not be believed because he was "in the [*2]clutches of the NYPD" at the time and had "t[old] the cops what they wanted to hear."

The jury convicted defendant on the murder and criminal weapon possession charges. The court sentenced defendant concurrently and imposed a sentence of 25 years to life imprisonment on the top count.

The Appellate Division affirmed (226 AD3d 597 [1st Dept 2024]). As relevant to our disposition of this appeal, the Court rejected defendant's constitutional speedy trial challenge and his claim that the trial court's failure to provide him with notice of two jury notes during his first trial required reversal of his drug-related convictions. A Judge of this Court granted defendant leave to appeal (42 NY3d 1082 [2025]).

II.

Constitutional Speedy Trial Claim

Defendant contends that the three-year delay between his third and fourth trials violated his constitutional right to a speedy trial. In People v Taranovich, this Court adopted a "holistic" approach to constitutional speedy trial claims (People v Johnson, 39 NY3d 92, 96 [2022], citing People v Taranovich, 37 NY2d 442, 445 [1975]), one that balances five factors to determine whether a defendant's constitutional right to prompt prosecution and speedy trial has been unjustifiably delayed. The Taranovich factors apply to both pre- and post-indictment delays (see e.g. People v Regan, 39 NY3d 459, 465-66 [2023] [pre-indictment delay]; People v Wiggins, 31 NY3d 1, 7 [2018] [post-indictment delay]). We now make explicit what the Court previously implied, namely that those same factors apply to retrials (see People v Rarback, 40 NY2d 922, 923 [1976] [concluding that a lengthy delay following mistrial did not violate the defendant's constitutional or statutory speedy trial rights]).

The five factors are:

"(1) the extent of the delay; (2) the reason for the delay; (3) the nature of the underlying charge; (4) whether or not there has been an extended period of pretrial incarceration; and (5) whether or not there is any indication that the defense has been impaired by reason of the delay" (Taranovich, 37 NY2d at 445).

"[N]o one factor or combination of the factors . . . is necessarily decisive or determinative of [a] speedy trial [or prompt prosecution] claim, but rather the particular case must be considered in light of all the factors as they apply to it" (Taranovich, 37 NY2d at 445). "The primary responsibility for assuring prompt prosecution rests with the prosecutors. Prosecutors may not needlessly delay without an acceptable excuse or justification, and a sufficiently lengthy unexplained delay may require [a court] to dismiss the indictment altogether" (Regan, 39 NY3d at 466 [internal quotation marks and citations omitted]).

Applying these legal principles here, we conclude that the three-year delay to retry defendant a fourth time was unjustified and violated his constitutional right to a speedy trial.FN1 "[W]hile the [*3]greater the delay, the more likely the harm to the defendant, there is no specific length of time that automatically results in a due process violation (Johnson, 39 NY3d at 96-97, citing Taranovich, 37 NY2d at 445-446). Here, the delay was lengthy—more than three years and one month between the third and fourth trials, and 36 months between the third trial and when the prosecution declared readiness for the fourth trial.FN2 The delay is even more stark when compared to the dramatically shorter time between the prior trials: six months between the first and second trials and eleven months between the second and third trials.

The "reason for the delay" factor is critical. Thus, in cases involving post-indictment delays, the prosecution's "good faith will not insulate their decision to delay trial from judicial review on constitutional speedy trial grounds" (Wiggins, 31 NY3d at 13). "[O]nce having instituted the prosecution . . ., [the prosecution has] the obligation of advancing it unless there is a reasonable ground for delay" (id. at 14 [internal quotation marks omitted]). By the time of the delay preceding the fourth trial, defendant had already been indicted and tried three times. That indictment remained pending throughout the three-year delay. Accordingly, the prosecution had the obligation of advancing its case in the absence of a reasonable justification (Wiggins, 31 NY3d at 14).

A lengthy delay "demands close scrutiny of the other factors, especially the question of why the delay occurred" (People v Romeo, 12 NY3d 51, 56 [2009], citing Smith v Hooey, 393 US 374, 383 [1969]). Here, the prosecution's justifications for the delay lack record support and in any case are not persuasive. The prosecution's claim that the delay was attributable to its consideration of defense counsel's request for dismissal after three mistrials cannot, without more, account for the three-year delay. The prosecution did not provide any particular reasons for why its deliberations of whether to retry defendant took so long given its failure to obtain a conviction three times in a row on the murder and weapon possession charges. Nor did the prosecution assert that an internal "changing of the guard" impacted its ability to render a decision on whether to retry the case.

Notably, the prosecution simply did not attend several scheduled court appearances between 2010 and 2013, and when it did, it often could not confirm whether the case would be retried. Indeed, both the court and defense counsel stated that they were unaware of what the District Attorney's [*4]office was doing for much of this period. Defense counsel further informed the court that the prosecutor was not returning his calls, belying the prosecution's assertion that the delay was due to ongoing negotiations with defense counsel. For example, when the prosecution did not appear at a calendar call on February 28, 2011, defense counsel informed the court that he had not heard from the prosecution. On May 23, 2011, the court referred to the case as "a long running show. . . with no end in sight," and explained it was awaiting a decision from the prosecution as to whether it was going to retry defendant. On September 12, 2011, the prosecution missed another calendar call. Defense counsel stated that he had not heard from the prosecution and the court noted that the "trial clock continues to click." Indeed, as of May 18, 2012, more than two years after the third trial, the prosecution still had not decided whether to retry the case and which prosecutor would be assigned. On that day, defense counsel stated during the calendar call that he had "no idea who is going to be on the case" and the court noted that a couple of weeks before, the prosecution had told the court that it "still hadn't made a final decision."

The prosecution's argument that it is "not solely responsible for the delay," as "the bulk of" the delay was caused by a "series of meetings held within the District Attorney's office at the request of defense counsel who sought a dismissal of charges in the interest of justice," is not supported by reference to any specific meeting dates or even an approximate period during which these meetings were held. The prosecution's cursory statement could be based on meetings during the first few months after the third trial or in the months immediately preceding the fourth trial. It is the prosecution's burden to explain a record showing months of inaction during the three-year delay.FN3

The prosecution further contends that the ADA who was finally assigned on December 14, 2012 required time to familiarize himself with the case. And yet, on April 29, 2013, the ADA appeared for the first time and stated that he had "been ready for trial continuously for three months." Thus, at best, on this record, there is a reasonable explanation for only about a month and a half of the prosecution's three-year delay—from December 14, 2012 to late January 2013.

The prosecution likewise did not meet its burden by reference to unspecified "reinvestigation" efforts. Notably, although at the fourth trial the prosecution put forth some new evidence, the prosecution did not claim that identifying or preparing additional witnesses, such as R.L., caused any part of its delay.FN4 Indeed, the prosecution only referred to "reassess[ment] and [*5]reinvestigat[ion]" in its motion papers when articulating black-letter law, and never made allegations that any efforts to reinvestigate the case in fact caused the delay. Beyond the prosecution's motion papers, the record contains no indication that the prosecution reinvestigated the case before the ADA was finally assigned in December 2012—two years and eight months after the third trial concluded.FN5

The prosecution's assertion that defense counsel failed to "formally raise[ ] any speedy-trial objection at any of the prior appearances since the third trial," ignores that the prosecution, not defendant, bears the burden to move forward with the retrial within a justifiable amount of time (see Wiggins, 31 NY3d at 11, 14). More to the point, it is not defense counsel's role to remind the prosecution of this duty. Even in the face of defense counsel's silence, the prosecution must still timely determine whether to dismiss the charges or retry defendant, and then it must take prompt action in accordance with its decision.

Admittedly the nature of the second-degree murder charge might explain some measure of delay. However, this factor does not support the prosecution here where "the preparation to which the People attribute a delay . . . was not complex" (Regan, 39 NY3d at 470) and where the People had already prepared and presented their case three times.

Furthermore, while defendant's incarceration during the delay was due to another crime, we have been clear that a "defendant's imprisonment for another crime cannot excuse the delay" (People v Singer, 44 NY2d 241, 254 [1978]). Such delay "may . . . interfere with [a defendant's] rehabilitation, particularly when [they are] already aware that [they are] suspected or 'known' to have committed the other offense" (Singer, 44 NY2d at 254).FN6 Three years is a substantial period for a defendant to wonder whether the prosecution would retry and prevail on a fourth trial and, if not, whether these charges really were a "show without end."

Lastly, although a defendant need not demonstrate actual prejudice in the face of a lengthy and unjustified delay (see Regan, 39 NY3d at 471), defendant was prejudiced by the lengthy delay here. Prosecutors may gain a strategic benefit where they can present "testimony in the more [*6]sheltered form of . . . minutes rather than in the confrontational setting of a personal appearance on the stand" (People v Tapia, 33 NY3d 257, 266 [2019]). R.G. died two years and six months after defendant's third trial, which necessitated readbacks of his prior testimony at the fourth trial. Reading the cold transcripts deprived the jury of the opportunity to assess R.G.'s credibility in person, diminishing the impact of the defense's attempts to challenge the credibility of one of the only two persons to identify defendant as the shooter—R.G. and E.C. Thus, the three-year delay, during which R.G. died, prejudiced defendant to the benefit of the prosecution.

While the dissent would remand this appeal for a fact-finding hearing rather than decide defendant's motion to dismiss today, this approach would unnecessarily prolong this proceeding and give the prosecution an unwarranted second opportunity to marshal facts where they already failed to meet their threshold burden of "rais[ing] a factual dispute on a material point" (see dissenting op at 4-5, citing People v Gruden, 42 NY2d 214, 215 [1977] [holding, in a statutory speedy trial case interpreting CPL 210.45, that "a motion may be decided without a hearing unless the papers submitted raise a factual dispute on a material point which must be resolved before the court can decide the legal issue"]). Any uncertainty regarding outstanding and unknown facts is a consequence of the prosecution's vague, conclusory, and thus deficient, opposition to defendant's constitutional speedy trial motion. The dissent's view of the prosecutor's burden in opposing a motion to dismiss under CPL 210.45 is no burden at all (see dissenting op at 8-9). As we have stated, "[g]enerally hearings are not available merely for the asking" (Gruden, 42 NY2d at 217). If the prosecution had provided as much information in their motion papers as found in the dissent, this might be a different case (see dissenting op at 10-12).

In sum, based on a holistic assessment of the Taranovich factors as applied to these circumstances, the prosecution violated defendant's constitutional right to a speedy trial. The three-year delay was substantial, and the record contains only vague assertions of the prosecution's reasons for its delay. Although the serious nature of the charges weighs in the prosecution's favor, this factor's importance is diminished by the fact that the prosecution had already unsuccessfully tried the case three times. Additionally, the lengthy pretrial incarceration, as well as the prejudice to the defense caused by the delay, weighs in defendant's favor.

III.

Jury Notes from the First Trial

We reject defendant's claim that the failure to provide proper notice of two jury notes during his first trial requires reversal of his convictions on the drug-related charges. Pursuant to CPL 310.30 and our O'Rama protocol, a trial court must notify defense counsel of substantive jury notes so that counsel is "afforded a full opportunity to suggest appropriate responses" and "can seek whatever modifications are deemed appropriate before the jury is exposed to the potentially harmful information" (see People v O'Rama, 78 NY2d 270, 278 [1991]). This requirement "ensure[s] a clear and complete record, thereby facilitating adequate and fair appellate review" (id.). Here, the record does not establish that counsel received notice of the "actual specific contents" (O'Rama, 78 NY2d 277) of two jury notes, submitted on October 9 and 10, 2008, requesting readbacks of the testimony of E.C. and R.G. Regardless, however, the jury submitted another note on the next day of trial, October 14, requesting, among other things, to hear the same testimony of these same two witnesses again. The record makes clear that the parties received notice of the exact contents of the October 14 note, discussed it, and agreed on what would be read back to the jury. Under these circumstances, the error in the court's approach regarding the prior two notes does not warrant reversal because the [*7]purpose of CPL 310.30 and our O'Rama jurisprudence was satisfied (see id. at 277-78).

IV.

We conclude that the prosecution's stated reasons for its lengthy delay before the fourth trial insufficiently explain why it took more than three years to decide whether to retry defendant on the murder and weapon possession charges. This unjustified delay violated defendant's constitutional speedy trial rights and requires dismissal of those charges. As to defendant's challenge to his convictions on drug-related charges in the first trial based on the trial court's handling of two jury notes, we find no basis to reverse. Our disposition of these challenges renders it unnecessary to consider defendant's remaining claims.

The order of the Appellate Division should be modified in accordance with this opinion and, as so modified, affirmed.

SINGAS, J. (Dissenting In Part):

It is a bedrock of criminal practice that when disputed facts are essential to deciding a party's motion, a court must hold a hearing to resolve these factual questions. The People may have violated defendant's constitutional speedy trial rights, but we will never know because the majority short-circuits criminal procedure, summarily granting defendant's motion when no hearing was ever held. Because the majority employs the drastic remedy of throwing out a jury's murder verdict for a constitutional violation it assumes occurred, I dissent.

I.

Defendant was charged with the execution-style murder of a rival drug dealer. Defendant's first trial ended in a conviction on three drug-related charges, an acquittal on an attempted murder charge, and a hung jury on the murder and related weapons possession charges. Defendant was retried on the murder and weapons possession charges within six months; his second trial ended in a mistrial. Defendant was tried for the third time in April 2010, just under a year after his second trial. That third trial also ended in a mistrial. Defendant's fourth trial, which ended in his conviction for murder and criminal possession of a weapon, began on June 5, 2013.

This appeal turns on what occurred between defendant's third and fourth trials. During that period, there were approximately 30 calendar calls on the status of defendant's case. Little is clear from the minutes of these calendar calls. The court often adjourned the case with no discussion on the record about who requested the adjournment or what purpose the adjournment served. These unexplained adjournments account for roughly 170 days, meaning this Court has no way of knowing why the case was delayed for at least one sixth of the period at issue. Defense counsel seemed at times to be having frequent conversations with the People about this case and potentially other charges. Several of the adjournments, accounting for roughly 148 days, were at defendant's request due to his speedy trial motion. At most times, information regarding the status of defendant's case was not placed on the record, as the prosecution often failed to appear FN1 or sent an ADA who was not assigned to the case. Often, no one present in court, including the ADA who appeared for the calendar call, seemed to have any information as to which ADA was assigned to the case or when (or if) the People would prosecute again. At these appearances, the prosecution requested an adjournment, as the People were not ready to proceed to trial.

Defendant's speedy trial motion and the People's response, at a minimum, present opposing views of this thin record. Defendant moved to dismiss on constitutional speedy trial grounds, supported by only an eight-page affirmation signed by his attorney and unaccompanied by any documentary evidence. In the affirmation, defendant alleged that "the People would routinely not attend the calendar calls or send a note concerning their intentions" and as of the filing of the motion, "the People ha[d] not given an explanation for their lack of readiness." Defendant did not suggest that the delay was due to the People's negligence or bad faith, but rather asserted repeatedly that the delay was "unexplained." Defendant further alleged that he was prejudiced by the delay because defendant's incarceration since his first trial was "oppressive," defendant had experienced "anxiety" waiting for a fourth trial, and defendant's defense was impaired by the death of a prosecution witness. The People opposed the motion, arguing relevantly that (1) only "a little over two years" had elapsed between defendant's third trial and the People declaring ready; (2) "the bulk of the period between defendant's last mistrial . . . and the instant trial have involved a series of meetings held . . . at the request of defense counsel who sought a dismissal of the charges in the interests of justice;" (3) the case was also delayed by the "practical reality" of reassignment and the need for the new prosecutor to familiarize themselves with the case; (4) the delay was partially because the prosecution was "reassess[ing] and reinvestigat[ing]" the case; and (5) the death of the prosecution's witness did not prejudice defendant, but benefitted him, as the witness was the only one not under a cooperation agreement. Significantly, defendant did not reply or attempt to rebut the People's submission, nor did he—as the majority now attempts to do for the first time—challenge the People's claims justifying portions of the delay.

Supreme Court denied the motion. The court's decision is not on the record, and the court did not hold a hearing regarding these competing narratives. On appeal, the Appellate Division affirmed, appearing to credit the People's assertions in their opposition to defendant's motion: "Although the three-year delay was significant, it was due in large part to the People's good-faith attempts to reassess and reinvestigate the case, and to correspond with defense counsel about potential disposition" (226 AD3d 597, 599 [1st Dept 2024]).

[*8]II.

I agree with the majority that Supreme Court should not have summarily denied defendant's motion.FN2 Unlike the majority, I would not summarily grant it, but remand for a hearing. The procedure for deciding constitutional speedy trial motions is governed by CPL 210.45 (see People v Lomax, 50 NY2d 351, 357-359 [1980] [applying CPL 210.45 to constitutional speedy trial motion]; People v McLaurin, 38 NY2d 123, 125-127 & n 1 [1975] [same]). Under CPL 210.45 (6), if the court determines that resolving factual issues is essential to deciding the motion, the court must hold a hearing (see People v Santos, 68 NY2d 859, 861 [1986] ["Where the papers submitted by the prosecutor show that there is a factual dispute, there must be a hearing"]; People v Gruden, 42 NY2d 214, 215 [1977] ["a motion may be decided without a hearing unless the papers submitted raise a factual dispute on a material point which must be resolved before the court can decide the legal issue" (emphasis added)]; People v Allard, 28 NY3d 41, 46 [2016] ["pursuant to CPL 210.45, unless the People's opposition conclusively refuted defendant's motion by unquestionable documentary proof, (the motion court) could not deny the motion without conducting a hearing" (internal quotation marks omitted)]). The court may only deny a motion without holding a hearing under very specific circumstances: if (1) the defendant fails to allege a qualifying basis for dismissal, (2) the motion papers do not contain sworn allegations supporting all essential facts, or (3) essential allegations are refuted by the People's unquestionable documentary proof (cf. People v Coffaro, 52 NY2d 932, 934 [1981]).

The procedure requiring a hearing to resolve contested facts under CPL 210.45 is not unique. This process features repeatedly throughout New York's thoughtfully constructed Criminal Procedure Law. For suppression motions, CPL 710.60 (4) requires that a hearing be held so the court may "make findings of fact essential to the determination" of the defendant's motion—the exact language used in CPL 210.45 (6). If the defendant's suppression motion contains a sufficient factual basis to support suppression, the People are entitled to a hearing if they merely "refuse to concede the truth of facts alleged by [the] defendant" (People v Weaver, 49 NY2d 1012, 1013 [1980]; see also People v Mendoza, 82 NY2d 415, 421, 433-434 [1993] [trial court erred by resolving a disputed factual issue without holding a hearing when defendant's motion relied on the factual allegation and the People disputed the allegation]; People v Ehinmiakhena, — NY3d —, — [2026] [decided today]). Similarly, under CPL 440.30 (5), the court "must conduct a hearing and make findings of fact essential to the determination" of a defendant's motion to vacate the judgment against them or set aside their sentence when such essential facts are at issue. Again, this requirement is identical to its CPL 210.45 counterpart. When defendant's motion to vacate their judgment or sentence raises an issue of fact, and that allegation is not conclusively refuted by the People, the court cannot summarily deny the motion without first "resolving [the] questions of fact" at a hearing (People v Salas, 44 NY3d 374, 384 [2025]; see CPL 440.30 [5]; People v Hartle, 40 NY3d 39, 52 [2023, Rivera, J., dissenting] [CPL 440.30 "creates a presumption that a hearing will be granted; only in the limited circumstances set out therein may a court avoid that obligation"]).

Other provisions of the CPL use similar language and require a hearing when facts essential to the disposition of a defendant's motion are at issue (see CPL 330.40 [2] [f] [providing that a hearing must be held to resolve questions of fact essential to the disposition of motions to set aside [*9]a verdict because of a juror's misconduct or newly discovered evidence]; People v Smith, 35 NY3d 1117, 1118 [2020] [concluding it was an abuse of discretion to deny the defendant's motion without a hearing under CPL 330.40]; CPL 420.45 [3]-[4] [providing that the court must hold a hearing when dealing with instruments affecting residential real property upon a defendant's conviction of a crime affecting title, encumbrance, or possession of real property]). It is a core tenet of the CPL that factual issues essential to the disposition of a motion must be decided at a hearing.

Indeed, in the speedy trial context, courts consistently hold that failure to conduct a hearing when the motion's resolution depends on issues of fact is error requiring remand for a hearing (see People v Vidal, 161 AD2d 313, 313 [1st Dept 1990] ["a factual dispute mandating a hearing existed on defendant's claim that the same delay violated his rights to a speedy trial under CPL 30.20 and the (United States) Constitution"]; People v Beckerman, 184 AD3d 850, 850 [2d Dept 2020] [issues of fact could "only be properly resolved at a hearing"]; People v Pittman, 221 AD3d 1256, 1259 [3d Dept 2023] [same]; People v Clark, 236 AD3d 1345, 1347-1348 [4th Dept 2025] ["Inasmuch as the People raised a factual dispute in its opposition papers, the court erred in failing to hold an adversarial hearing with respect thereto"]; see also People v Rosa, 164 AD3d 1182, 1183 [1st Dept 2018] ["A hearing on the motion was not required because there were no issues of fact for the court to resolve, inasmuch as defendant made mere conclusory assertions in support of his motion"]; People v Yarbrough, 158 AD2d 811, 812 [3d Dept 1990] ["a hearing pursuant to CPL 210.45 was necessary (to resolve a constitutional speedy trial motion) only if the papers presented showed the existence of a factual dispute"]). Our Court has endorsed this rule. In People v Allard, we affirmed an Appellate Division order remitting a statutory speedy trial motion to the motion court because it was decided without a hearing in violation of CPL 210.45 (see 28 NY3d at 45-47).

To be sure, this Court has reviewed and decided constitutional speedy trial claims when the motion was decided without a hearing, but only when essential facts were not in dispute (see People v Wiggins, 31 NY3d 1, 10 [2018] [concluding the prosecution violated the defendant's right to a speedy trial but acknowledging that "(h)ere, the reason for the delay (wa)s not a disputed factual issue"]; People v Decker, 13 NY3d 12, 14-16 [2009] [concluding that the 15-year delay did not violate defendant's due process right to a prompt prosecution]; brief for defendant in Decker, 13 NY3d 12, available at 2009 WL 1615307, *22-25 [citing the prosecution's reasons for the delay, but arguing they were not legally sufficient to justify the delay]). And we have remitted a constitutional speedy trial claim for lack of factual development. In People v McLaurin, the parties disputed whether the prosecution had a reasonable basis for delay caused by the defendant's incarceration in another state, and there was no evidence on the record regarding whether the prosecution knew the defendant's whereabouts (see 38 NY2d at 125-126). Because "[t]he insufficiency of the record . . . ma[de] it impossible to determine whether a reasonable basis for the delay was present," we remitted the matter so the motion court could develop a factual record (id. at 126-127).

Here, defendant alleged a qualifying ground for dismissal—a violation of his constitutional right to a speedy trial (see CPL 210.45 [5] [a]). Defendant submitted a sworn affidavit alleging facts supporting his claim (see id. § 210.45 [5] [b]). The majority rests its entire opinion on defendant's allegations without wrestling with the fact that the People neither conceded those allegations nor submitted documentary proof rebutting them (see id. § 210.45 [4] [c]; [5] [c]). Instead, the People contested several relevant facts, including (1) how much of the delay between defendant's third and fourth trial was the fault of the People, (2) the People's reasons for that delay (including the People's allegations, unrebutted by defendant, that defendant and the People were meeting to discuss a resolution to the case), and (3) whether the seriousness of the murder charges contributed to the [*10]delay. Because the People denied defendant's allegations, the court was obligated to hold a hearing under the plain text of CPL 210.45 and settled law (see McLaurin, 38 NY2d at 126-127; cf. Weaver, 49 NY2d at 1013 [the People need only "refuse to concede the truth of facts alleged by (the) defendant for a hearing to be held"]). It was thus reversible error to decide defendant's motion without a hearing.

III.

The majority calls this basic practice into question with only a cursory citation to the relevant legal standard. Instead, the majority repeatedly claims that the People failed to "meet their threshold burden of 'rais[ing] a factual dispute on a material point,' " (e.g. majority op at 13). As already explained, the prosecution disputed defendant's factual allegations, which clearly satisfied the statutory threshold for a hearing (see CPL 210.45 [4]-[6]), and the majority lacks the statutory or constitutional power to resolve issues of fact in the absence of a record.

Even putting aside that the majority misstates the People's burden, it is evident that the majority cannot reach its ultimate conclusion without resolving the very issues of fact it claims do not exist. In doing so, the majority makes the same mistake as the Appellate Division below: impermissibly choosing to credit one party's version of events while glossing over facts disputed by the opposing party and the parts of the record which contradict its holding. Even if the CPL did not prohibit the majority's procedural end-run, this Court is "jurisdictionally prohibited from making factual findings" as our "authority extends only to deciding questions of law" (People v Baez, 42 NY3d 124, 132 [2024]). But the majority crafts its own factual record as to each relevant factor provided by People v Taranovich (37 NY2d 442, 445 [1975]), ultimately concluding that its version of events satisfies its extrastatutory analysis.

Without the benefit of a complete factual record, attempting a "holistic assessment of the Taranovich factors as applied to these circumstances" is futile (majority op at 13). Undaunted, the majority persists.

Regarding the first and second Taranovich factors, the extent of the delay and the reason for the delay (see Taranovich, 37 NY2d at 445), the majority credits defendant's assertion that that the 36 months between the third and fourth trials were entirely the People's fault, rejecting the People's assertion that defendant contributed to parts of the delay (see majority op at 8-9). Although the majority cursorily acknowledges that part of the delay may be attributable to discussions with defense counsel, internal discussions about the prospect of retrial, and efforts to reinvestigate defendant's case, it merely states, without any support, that this "cannot, without more, account for the three-year delay" and chastises the prosecution for failing to cite "particular reasons" or "specific meeting dates" for the prosecution's internal meetings and meetings with the defense (majority op at 8-10). As explained, the majority does not possess the statutory or jurisdictional power to reject the People's explanations. The majority also confusingly asserts that the record contains no evidence that the prosecution was reinvestigating before a new ADA was assigned shortly before the fourth trial (see majority op at 11). The record contains no evidence pertaining to reinvestigation efforts because no record was made, and the majority denies both parties the opportunity to make such a record. Regardless, the prosecution secured the testimony of two new witnesses for defendant's fourth trial, supporting the contention that they reinvestigated. Moreover, the People may have had valid reasons to conceal the specifics of their reinvestigation efforts and the office's internal discussions regarding whether to go forward with a fourth trial given the witnesses' fear of testifying. Had the court held a hearing as the CPL requires, any decision regarding the reason and extent of delay would have been based on facts developed at that hearing, rather than the majority's surmise.

The majority also gives short shrift to the remaining Taranovich factors—the nature of the underlying charge, whether defendant was incarcerated during the delay period, and prejudice (see 37 NY2d at 445)—and asserts that such factors barely impact this case (see majority op at 11-13). Because I agree with the majority that balancing the Taranovich factors requires a "holistic" analysis (majority op at 13), I would not discount them. Defendant was charged with murder, "inarguably a very serious offense" (Decker, 13 NY3d at 15). Defendant did not argue in his speedy trial motion that the seriousness of the charges did not contribute to the delay but simply asserted that facing serious charges should not weigh against his speedy trial right. The majority credits that argument without providing support from the record that the People's preparation here was not complex, seemingly concluding that preparation for a third retrial of a murder conviction is uncomplex as a matter of law (see majority op at 11-12). The majority ignores the trial record indicating that preparation for defendant's third retrial was indeed complex, as the People reinvestigated and secured two new witnesses' testimony and grappled with the death of a key eyewitness.FN3 Additionally, as to the fourth factor, defendant did not spend a single day incarcerated because of the delay. Defendant was serving a nine-year sentence resulting from his conviction for drug-related charges in his first trial, which covered the pendency of his three retrials. To be sure, "defendant's imprisonment for another crime cannot excuse the delay" (majority op at 12, quoting People v Singer, 44 NY2d 241, 254 [1978]), but this factor does not support defendant nor outweigh the other three factors. Certainly, information outside the record regarding the conditions at Riker's Island, where defendant was held during the delay, cannot tip the Taranovich scales in defendant's favor when no one, not even defendant, claimed before the trial court that such conditions affected defendant's ability to prepare his defense or contributed to the delay (see majority op at 12 n 6). Finally, the record does not support that defendant was prejudiced by the delay. There is no basis in this record to conclude that defendant's case was negatively impacted by the death of a prosecution witness, as both the People and defendant had to rely on a cold transcript for this eyewitness's key testimony (see majority op at 12-13). There is also no evidence that defendant faced difficulties in preparing his defense because he was incarcerated, as the majority suggests (see majority op at 12). Nor does the fact that defendant may have "wonder[ed] whether the prosecution would retry and prevail on a fourth trial" (majority op at 12), constitute the type of prejudice contemplated in Taranovich, which predominantly refers to defendant's ability to mount a defense (see 37 NY2d at 446-447).

To decide defendant's motion without remitting for a hearing pursuant to CPL 210.45, the majority must implicitly hold that the resolution of these factual issues is nonessential to the disposition of defendant's motion (see CPL 210.45 [6]). That position is untenable. Our speedy trial analysis depends on "sensitive weighing" of the relevant factors (People v Vernace, 96 NY2d 886, 887 [2001]). And as the majority notes, the " 'reason for the delay' factor is critical" (majority op [*11]at 8). How can the majority sensitively weigh such critical factors and accurately assess the merits of defendant's claim without confronting these factual discrepancies? The result is a de facto statute of limitations based on how long the majority (and other courts to follow) believes a murder retrial should take, overruling the legislative directive that some crimes are too heinous to justify a prescribed statutory speedy trial limit (see CPL 30.30 [3] [statutory speedy trial limits do not apply to murder charges]).

The majority's opposition to remanding for a hearing is apparently that such a remedy would "unnecessarily prolong this proceeding and give the prosecution an unwarranted second opportunity to marshal facts" against defendant's motion when the People "already failed to meet their threshold burden" (majority op at 13). But the parties were never afforded a first opportunity to present their evidence, and the controlling statute and our precedent mandate a hearing under these circumstances. That should end the proceedings before this Court.

* * *

The majority casts aside the CPL and this Court's jurisdiction, instead cherry-picking a version of the facts to conclude that a speedy trial violation occurred while ignoring material and contradictory portions of the record. This time the People did not have the opportunity to litigate the issue. Next time, as judges randomly resolve factual issues by deciding which motion papers they find more compelling, it may well be defendants who are deprived of the right to develop a factual record upon which significant rulings rest. The CPL was designed to eliminate this precarious situation. We ignore it at our peril.

Order modified in accordance with the opinion herein and, as so modified, affirmed. Opinion by Judge Rivera. Chief Judge Wilson and Judges Troutman and Halligan concur. Judge Singas dissents in part in an opinion, in which Judges Garcia and Cannataro concur.

Decided April 21, 2026

Footnotes

Footnote 1

Given that we are dismissing defendant's murder and weapon possession convictions based on this constitutional speedy trial violation, we have no occasion to address defendant's remaining claims related to the fourth trial.

Footnote 2

According to the dissent, the prosecution "relevantly" argued in its motion papers that "only 'a little over two years' had elapsed between defendant's third trial and the People declaring ready" (dissenting op at 3-4). However, this claim is unsupported by the record. The third mistrial was declared on April 5, 2010, and the prosecution did not declare ready on the record for the fourth trial until April 29, 2013—more than three years later. Moreover, the prosecution actually argued in its motion papers that "a little over two years have elapsed between the last mistrial and when the People next answered ready for trial" (emphasis added). If the prosecution answered ready for trial at some point prior to April 29, 2013, the record contains no record of such statement. Further, any statement of readiness that was made "a little over two years" after the third trial would have been illusory: the prosecution was represented by five different stand-in prosecutors at calendar calls throughout 2012 before finally assigning the case on December 14, 2012 to the ADA who would try the case. That ADA, like the prosecutors who came before him, was not ready on that day either. The prosecution then failed to appear at subsequent calendar calls in early 2013 prior to declaring ready on April 29, 2013.

Footnote 3

Even assuming that the ADA's assertions based on information and belief are sufficient in this context to raise an issue of fact necessitating a hearing (see dissenting op at 4-5, 7-9), the alleged series of meetings cannot excuse the prosecution's delay as a matter of law (see United States v Tigano, 880 F3d 602, 615 [2d Cir 2018] [" 'Good faith plea negotiations by a defendant should not be equated to a waiver of speedy trial rights . . . (T)he government must assume responsibility for the risk of institutional delays where the bargain ultimately is unsuccessful' "]; cf. United States v Swinton, 797 Fed Appx 589, 595 [2d Cir 2019] [counting a portion of delay against defendant "because it arose from his challenges to his Florida conviction, his changes of counsel, and his filing of an omnibus motion, which included a complex motion to suppress"]).

Footnote 4

Indeed, the prosecution was aware of R.L. as of 2006, when he allegedly identified the shooter in the Miller murder to the police.

Footnote 5

Specifically, a detective testified that he was able to locate and speak to nine witnesses, including R.L., at the prosecution's request, but the detective did not become involved in the case until 2013. Similarly, R.L.'s testimony does not indicate that he spoke with anyone in the District Attorney's office in 2010, 2011, or 2012. Finally, the prosecution subpoenaed a store owner located in the vicinity of the 2006 shooting, but that does not appear to have occurred until 2013.

Footnote 6

The potential impact of incarceration on defendant's chance for rehabilitation is evident in the record. His transfer to a state correctional facility was delayed, resulting in his confinement for a total of seven years at Riker's Island, a facility with a well-documented and notorious reputation (see e.g. Independent Rikers Commission, A Path Forward: The Blueprint to Close Rikers at 12-14 [2025]; Independent Commission on New York City Criminal Justice and Incarceration Reform, A More Just New York City at 25-28 [2017]; Steve J. Martin et al., Special Report by the Nunez Independent Monitor at 5-13 [June 8, 2023]). Indeed, defendant claims he suffered physical injuries at Riker's during the period between the third and fourth trials.

Footnote 1

The adjournments due to the prosecution's lack of appearance account for roughly 331 days, or approximately 11 months.

Footnote 2

I also agree with the majority that defendant's claim regarding his first trial should be rejected (see majority op at 14-15).

Footnote 3

Nor, as a general matter, are decisions regarding whether to move forward with a retrial on a murder conviction as simple as the majority makes them seem (see majority op at 11-12). The People must weigh issues of accountability for the heinous crime against responsibility for public safety and consideration for the victim's family. Additionally, the prosecution must review (in this case) the records of three previous trials, ensure that previously testifying witnesses are still available and persuasive, and reassess the allocation of limited resources to a case which has already proven difficult.